IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| United States of America | ) | |
| | ) | Criminal No. 2:07-738-PMD |
| v. | ) | |
| | ) | **ORDER** |
| Otis Leon Story | ) | |
| a/k/a Shawn Jones | ) | |
| | ) | |
| _____ | ) | |

This matter is before the court upon the Defendant Otis Leon Story's a/k/a Shawn Jones's ("Defendant" or "Story") Motion to Suppress and Motion to Dismiss Indictment. A hearing was held on April 8, 2008 at 10:00 a.m. For the reasons set forth herein, the court denies the Defendant's motion.

**BACKGROUND**

On April 23, 2007, Kia Drayton ("Drayton") registered and paid cash for a single night stay in Room 411 at the Marriott Residence located near the Charleston Airport at 5035 International Boulevard, North Charleston, South Carolina. She was accompanied by the Defendant, and the two spent the night in Room 411. On the morning of April 24, 2007, at approximately 11:00 a.m., before the check-out time of noon, Drayton went to the front desk of the hotel and extended the stay in Room 411 through noon on April 25, 2007, again paying cash. Michael Kapoulis, the hotel's general manager, testified at the hearing that the desk clerk originally checked Drayton out of Room 411 but that Kapoulis checked her back into that room. After paying for the additional night, Drayton and Story drove to Atlanta and did not return to North Charleston until around 9:30 a.m. on April 25.

On April 24, 2007, at approximately 9:23 a.m. (before Drayton extended the stay), the cleaning staff of the hotel received a computer-generated checklist describing their room cleaning

assignments for the day.  This computer print-out revealed that Room 411 was registered to Kia Drayton for the night of April 23 and that the room was occupied, dirty, and was a scheduled checkout.  (Mot. to Suppress Ex. A.)  At some point, the maid noted on this 9:23 a.m. checklist that Room 411 was vacant and ready ("VR").  (*Id*.)  A checklist generated by the computer at 11:49 a.m. indicated that Room 411 was vacant and ready, but it also noted that the occupants extended their stay to two nights.  (Mot. to Suppress Ex. B.)  At 12:52 p.m., the cleaning staff confirmed that Room 411 was vacant and ready.  (Mot. to Suppress Ex. C.)

Between the time that Drayton and Story left the hotel on April 24, 2007 (which was between 11:00 a.m. and 11:30 a.m.) and 12:52 p.m., the maid entered Room 411 to clean it.  Although it is not entirely clear from the record who first made the discovery–the maids[1] or the hotel's head housekeeper, Paul Holland–Holland entered Room 411 to perform his inspection and discovered a black bag in the closet and observed that the in-room safe located in the closet was locked. Holland's witness statement avers that he checked Room 411 pursuant to his everyday duties and that his records indicated the room was vacant and dirty, meaning it could be sold to an arriving guest.  (*See* Holland's witness statement at 1.)  Finding a black bag hanging in the closet and the safe to be locked, he removed the black bag to take to the lost and found and called the engineering staff to unlock the safe, which, according to him is a "normal procedure so that the safe is ready to use for the next guest."  (*Id*.)  He then continued with his inspections, and while he was in Room 308, he was informed by the engineer who unlocked the safe (Glen Loy) that Loy had found another item

---

[1]Defendant states in his Motion to Suppress, "Believing that the guests had checked out of the hotel and inadvertently left the gym bag and perhaps something inside the locked safe, the maid contacted the head housekeeper, Paul Holland (hereinafter Holland)."  (Mot. to Suppress at 5.)

for lost and found.  (*Id*. at 1-2.)  Loy brought the item to Holland, and together Holland and Loy made the decision to open the package "in case it was biodegradable (or could spoil) so that there was not put a food item or something that would spoil sitting in a lost and found locker for up to ninety (90) days."  (*Id*. at 2.)[2]  Using a knife, Loy sliced an opening about one and a half inches long, and doing so revealed a white powder.  Upon seeing the contents of the package, Holland and Loy concluded that it was suspicious and called the general manager, who took the item.  (*Id*.)

Holland and Loy summoned the hotel manager, Michael Kapoulis, to Room 308, and Kapoulis determined, after examining the item and the powder coming from it (as well as noticing the chemical smell), that the item was likely an illegal substance.  (*See* Kapoulis's witness statement at 1.)  After making this determination, Kapoulis decided to contact the police, so he placed the package in the black gym bag and took the bag to his office.  Once he reached his office, he contacted the North Charleston Police Department.

Officer David Campbell of the North Charleston Police Department was dispatched to the Residence Inn at 2:19 p.m., and he arrived there at 2:26 p.m.  Officer Campbell entered the hotel and followed Kapoulis to Kapoulis's office, where Kapoulis opened the black gym bag now containing gym shoes, some men's gym clothing, and the duct-taped package.[3]  Office Campbell then saw the duct-taped package and the white substance inside, and he took his pocket knife and scraped the substance.  Pieces of a white substance flaked off, and Officer Campbell then took the black gym

---

[2]At the hearing, Loy testified that in the past, he has found fast food wrappers and partially eaten hamburgers locked inside the in-room safes after the guests departed.

[3]While there seems to be some inconsistency regarding where Officer Campbell was physically located when he first came in contact with the duct-taped package, both Officer Campbell and Kapoulis testified at the hearing that they were in Kapoulis's office at that time.

bag and the package back to his patrol car, where the substance in the package field tested positive presumptive for cocaine. After performing this field test at his car, Officer Campbell took the black bag and the duct-taped package back to the West Precinct. Because he was unsure how long the field test had been in the back of his patrol car, he again tested the substance with a new field kit that also tested presumptive for cocaine. Officer Campbell then contacted the Narcotics Division of the North Charleston Police Department.

The Narcotics officers created a "sham" kilogram of cocaine replicating the actual package discovered. Sometime during the afternoon of April 24 or the early morning of April 25, the North Charleston Police Department conducted a search of Room 411, returned the gym bag to Room 411, installed video and audio equipment in Room 411,[4] and placed the "sham" cocaine back into the safe in Room 411.[5] Story and Drayton returned to the hotel at approximately 9:30 a.m. on April 25, 2007. The two went to Room 411, but the card key did not work, as the hotel had complied with police instructions to change the lock on the door. Drayton went to the front desk to obtain a new key, and when she returned to the fourth floor, she and Story entered Room 411. Minutes later, Story exited Room 411 carrying the black gym bag. As Story was making his way to the elevator, police saw him speak to several housekeepers, and although the housekeepers did not give a written

---

[4]This equipment did not work.

[5]On reading the parties' memoranda, there appears to be some dispute as to where the officers placed the sham cocaine. In his Motion to Suppress, the Defendant suggests the officers placed the sham kilogram of cocaine into the black gym bag. Based on the evidence presented at the hearing, however, the court concludes the officers placed the sham cocaine in the safe.

As Corporal Brian Adams testified, once the safe was opened, any memory of the four-digit code used by the person who initially placed the package in the safe was erased. Corporal Adams testified that when he placed the sham cocaine in the safe, he simply closed the safe door without touching any of the number keys because he did not want the safe to lock.

4

statement, they "verbally stated Otis Story inquired about the room and if anyone had been in the room or messed with the safe in the room." (Resp. in Opp'n Ex. I.)

Once Story walked away from the housekeepers, he was arrested by police. Inside the black gym bag he was carrying was the "sham" kilogram of cocaine. Drayton was also arrested at this time. After the arrests, the officers conducted a search of the Cadillac Escalade that Drayton and Story had arrived in, and officers found two handguns placed in between the roof and the sunroof cover. (*See* Resp. in Opp'n Ex. J.)

On June 13, 2007, a grand jury indicted Defendant with one count of possessing with the intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) as well as one count of using, possessing, and carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i).

On March 6, 2008, Defendant filed a motion seeking to suppress evidence he asserts was illegally seized by police, demanding a *Leon/Franks* hearing, and seeking to dismiss the indictment. Story first argues that the search and seizure of the gym bag containing the duct taped package without a warrant was a violation of his Fourth Amendment rights. (Mot. to Suppress at 15.) Story then argues that Officer Campbell's search and seizure of the package was illegal, arguing Officer Campbell exceeded the scope of the private search and that the seizure in this case was intended to be permanent. (*Id*. at 18-19.) Story also argues that Officer Campbell's "illegal search and seizure of the cocaine and the black bag cannot be the basis for a subsequent search warrant for room 411." (*Id*. at 21.) Story then demands a *Leon/Franks* hearing, asserting there was no probable cause to issue the search warrant and that the good faith exception to the exclusionary rule does not apply. (*Id*. at 21-22.) He states, "The magistrate or judge in issuing a warrant was misled by information

in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." (*Id*. at 22.) Lastly, Story seeks dismissal of the indictment, asserting there was no probable cause to arrest him and that there was no valid search of the black bag incident to his arrest. (*Id*. at 24.)

## ANALYSIS

**A.    Motion to Suppress**

The Fourth Amendment states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. This Amendment protects against unreasonable searches and seizures by government officials and "those private individuals acting as 'instruments or agents' of the Government." *United States v. Jarrett*, 338 F.3d 339, 344 (4th Cir. 2003); *see also Coolidge v. New Hampshire*, 403 U.S. 433, 487 (1971). It does not, however, provide protection against searches by private individuals acting in a private capacity. *Jarrett*, 338 F.3d at 344 (citing *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (holding that the Fourth Amendment is "wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official")). Thus, any evidence secured by private searches, even if illegal, need not be excluded from a criminal trial. *Id*. (citing *Walter v. United States*, 447 U.S. 649, 656 (1980)); *see also United States v. Kinney*, 953 F.2d 863, 865 (4th Cir. 1992).

Determining whether the "requisite agency relationship exists 'necessarily turns on the

6

degree of the Government's participation in the private party's activities, . . . a question that can only be resolved in light of all the circumstances.'" *Jarrett*, 338 F.3d at 344 (quoting *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 614-15 (1989)).  This fact-intensive inquiry is guided by common law agency principles, and the defendant has the burden of proving that the private party acted as an agent of the government.  *Id*.; *United States v. Ellyson*, 326 F.3d 522, 527 (2003).  "[T]o run afoul of the Fourth Amendment, . . . the Government must do more than passively accept or acquiesce in a private party's search efforts.  Rather, there must be some degree of Government participation in the private search." *Jarrett*, 338 F.3d at 344.  In other words, the Government must do "'more than adopt a passive position toward the underlying private conduct.'"  *Id*. (quoting *Skinner*, 489 U.S. at 615).  There must be "some evidence of Government participation in or affirmative encouragement of the private search before a court will hold it unconstitutional." *Id*. at 346.

The Fourth Circuit noted that "Courts of Appeals have identified two primary factors that should be considered in determining whether a search conducted by a private person constitutes a Government search triggering Fourth Amendment Protections." *Id*. at 344.  These two factors are "(1) whether the Government knew of and acquiesced in the private search; and (2) whether the private individual intended to assist law enforcement or had some other independent motivation." *Id*.  While the Fourth Circuit indicated that it had "never articulated a specific test," it noted that it had embraced this two-factor approach.  *Id*. at 345.

In the case *sub judice*, Defendant asserts the question this court must decide is "whether the police action falls within the parameters set forth in *Jacobsen*, which would not provide Fourth Amendment protection to Story or whether, as claimed by Story, that the search and seizure of the

gym bag containing the duct taped package, without a warrant, was a violation of the Fourth Amendment rights of the defendant." (Mot. to Suppress at 15.)  In *United States v. Jacobsen*, 466 U.S. 109 (1984), Federal Express employees opened a package that had been damaged and torn by a forklift in order to examine the package's contents "pursuant to a written company policy regarding insurance claims." *Jacobsen*, 466 U.S. at 111.  After cutting the tube contained in the box open, the employees discovered a series of four zip-lock plastic bags, with the inner bags containing several ounces of white powder. *Id.*  The employees notified the Drug Enforcement Administration and then placed the tube back into the box. *Id.*  When the first federal agent arrived, he saw the open box and the tube that had been slit open; he removed the plastic bags from the tube and saw the white powder. *Id.* at 111-12.  This officer removed a small portion of the white substance, which field tested positive as cocaine. *Id.* at 112.

The agents subsequently obtained a warrant to search the place to which the package was addressed, executed the warrant, and arrested the respondents. *Id.*  The respondents sought to suppress the evidence on the ground that the warrant was the product of an illegal search and seizure, but the district court denied the motion. *Id.*  The Court of Appeals reversed, holding that "the validity of the search warrant depended on the validity of the agents' warrantless test of the white powder, that testing constituted a significant expansion of the earlier private search, and that a warrant was required." *Id.*  The Supreme Court reversed the Court of Appeals, concluding that the respondents had no privacy interest in the contents of the package "since it remained unsealed and since the Federal Express employees had just examined the package and had, of their own accord, invited the federal agent to their offices for the express purpose of viewing its contents." *Id.* at 119.  The Court stated, "The agent's viewing of what a private party had freely made available

8

for his inspection did not violate the Fourth Amendment." *Id*. Furthermore, the Court concluded the agent's removal of the plastic bags from the tube and his visual inspection of their contents was not a "search" within the meaning of the Fourth Amendment because it "enabled the agent to learn nothing that had not previously been learned during the private search." *Id*. at 120. The Court then concluded that the "additional intrusion occasioned by the field test, which had not been conducted by the Federal Express agents and therefore exceeded the scope of the private search," was not an unlawful search or seizure within the meaning of the Fourth Amendment. *Id*. at 122-26.

While Story concedes that a private search and seizure of contraband does not violate the Fourth Amendment "because of the private character of the person(s) who conducted the search and seized the contraband, [he] submits that there are aspects of the search and seizure in the instant case that remove it from the *Jacobsen* doctrine." (Mot. to Suppress at 15-16.) According to Defendant, the evidence "unequivocally confirm[s] that the private party (hotel management and staff) intended to assist law enforcement in conducting the search by calling the police and presenting them with the gym bag containing the taped package which they had removed from the safe and opened prior to Officer Campbell's arrival." (*Id*. at 16.) Such an assertion is not supported by the evidence in this case. Defendant himself concedes that the housekeeping staff mistakenly entered Room 411 on the belief that it had been vacated, (*see id*.), and even in reading the statement of Paul Holland, it appears that when he was inspecting the room, he still believed it to be vacated, as he indicated he was going to take the gym bag to the lost and found. After Loy retrieved the package from the safe, he called Holland to tell Holland that he had another item for the lost and found. Furthermore, the evidence indicates that hotel staff decided to cut a hole in the package in order to ensure that nothing biodegradable was inside.

Based on Defense counsel's questioning of Kapoulis at the hearing, it appears Defendant is arguing that Kapoulis was an agent of the police.  Kapoulis testified at the hearing that while employed at a hotel in Springfield, Missouri, the police there were involved in educating those who ran hotels as to what to do when they encountered a suspicious package, indicating that the hotel employee should contact police.  Such evidence does not create an agency relationship.  Furthermore, it was not Kapoulis who removed the package from the safe or cut the package open; he simply took the package from Holland and Loy and then called police.

The Government did not know of the private conduct at the time the white powder was discovered by hotel management, so the Government certainly did not acquiesce in that private search.  Even if hotel management and staff intended to assist law enforcement, that fact alone would not transform hotel employees into governmental agents.  *See Jarrett*, 338 F.3d 339 (concluding, despite the private party's interest in assisting law enforcement authorities, that evidence obtained by the private party's search was admissible because the Government did not acquiesce in this search); *see id*. at 346 (noting that "after-the-fact conduct cannot serve to transform the prior relationship" between the private party and the Government into an agency relationship with respect to a private search that occurred before the conduct at issue).

Defendant asserts that "[w]hat has not yet been determined as a matter of law is whether the government 'knowledge' is an independent action as it relates to government 'acquiescence' and whether or not the knowledge and/or the acquiescence relates to past or future action."  (Mot. to Suppress at 16.)  To the extent Defendant is arguing that the hotel employees became agents of the Government due to some acquiescence on the part of the Government after the private search was over, the court disagrees.  Such a situation arose in *Jarrett*, where an email exchange between the

private individual and the Government "probably does constitute the sort of active Government participation sufficient to create an agency relationship going forward." *Jarrett*, 338 F.3d at 346. The Fourth Circuit noted that the email exchange "took place *after* Unknownuser had hacked into Jarrett's computer, *after* the fruits of Unknownuser's hacking had been made available to the FBI, *after* Jarrett's home and computer had been searched, and *after* Jarrett himself had been arrested." *Id*. The court concluded such after-the-fact conduct "cannot serve to transform the prior relationship between Unknownuser and the Government into an agency relationship with respect to the search of Jarrett's computer." *Id*.

In summary, the court concludes the agency relationship has not been established because there was no acquiescence. The only evidence of acquiescence on the part of police appears to be that Officer Campbell responded to the call and took the drugs. At the time the hotel employees removed the package from the safe and determined it contained white powder, police had not yet been notified. *See Ellyson*, 326 F.3d at 527 (noting that in determining whether a private party acted as an agent of the Government, a "highly pertinent consideration" is whether the Government "knew of and acquiesced in the intrusive conduct"). There is no evidence that, at the time of the intrusive conduct, the Government either knew of it or acquiesced in it, nor is there any evidence that further private action was taken with respect to the package (other than giving it to police) once Kapoulis contacted police. Furthermore, even if there were conduct that indicated an acquiescence, all of it had to come after-the-fact of the private search, as the Government knew nothing of it at the time it was occurring. Defendant repeatedly highlights the "illegal" conduct of the employees in opening a locked safe within a private room and transporting the package to another room. However, none of these arguments changes the fact that the search was committed by a private party and that there

11

is no evidence the Government acquiesced in that conduct.  Defendant states, "At some point between the moment when the locked in-room safe was illegally opened until the point when Officer Campbell walked out of the hotel, carrying the gym bag with the package inside, the hotel staff became his agents and the illegal private search became an illegal government search."  (Mot. to Suppress at 17-18.)  However, it appears that the last hotel employee action with respect to the package was taking it to Kapoulis's office, which occurred before police arrived.  The court thus concludes that no evidence needs to be excluded based on Story's argument that hotel employees became agents of the Government.  *See United States v. Kinney*, 953 F.2d 863, 865 (4th Cir. 1992) ("No Fourth Amendment concern is posed by Akers' [(the private party)] actions prior to the arrival of the police.").

Story's second argument is that Officer Campbell's search and seizure of the package and black bag was illegal; he argues Officer Campbell exceeded the scope of the private search and that the seizure in this case was intended to be permanent.  (Mot. to Suppress at 18-19.)  Story first argues that Campbell, when he searched the contents of the gym bag, exceeded the scope of the search performed by the hotel employees.  In *Jacobsen*, the Supreme Court stated, "The additional invasions of respondents' privacy by the government agent must be tested by the degree to which they exceeded the scope of the private search."  *Jacobsen*, 466 U.S. at 115.  "The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated."  *Id*. at 117; *see also United States v. Kinney*, 953 F.2d 863, 865-66 (4th Cir. 1992) (rejecting the defendant's argument that by recording the serial numbers on the guns, the police effectuated an infringement on the defendant's expectation of privacy beyond that occasioned by the private search); *United States v. Vandergrift*, 941 F. Supp.

604, 605 (S.D. W. Va. 1996) (concluding the officer's actions did not violate the Fourth Amendment because his search did not exceed the scope of the private search).

In the case *sub judice*, it does not appear that Officer Campbell exceeded the scope of the search performed by the hotel employees. Kapoulis testified at the hearing that he opened the gym bag and put the duct-taped package inside because he did not want to be seen carrying the package through the hotel. Thus, prior to the time Kapoulis contacted police, hotel employees both opened the gym bag and cut a small hole in the package. There is no evidence that Officer Campbell's search exceeded that of the hotel employees. To the extent Story argues that Campbell exceeded the scope of the hotel employees' search by performing a field test for controlled substances, that argument has been rejected by the Supreme Court. *See Jacobsen*, 466 U.S. at 122-26.

Story also argues, however, that Officer Campbell's search and seizure of the package and black bag was illegal because the seizure was intended to be permanent, but he did not obtain a warrant to seize the property. (Mot. to Suppress at 18.) Defendant states, "Unlike the seizure in the *Jacobsen* case which was designed only to be a temporary one for the purpose of investigating, seizing and testing the package's contents, we claim that the seizure in our case was intended to be permanent from the outset." (*Id*.) According to Defendant,

> When the officer observed the package, there were three courses of action which he could have taken, all of which would have been legal. He could have (1) scrutinized the substance in the package by sight and taste and after doing so, if there was a reasonable basis for believing it was contraband, he could have temporarily seized the package by securing it at the hotel until he obtained a proper warrant to allow him to search and to legally seize the package, or (2) if he were capable of doing so, he could have field tested the substance in the duct taped package and if it tested positive for cocaine, he could have temporarily seized the package by securing it at the hotel and sought a legal warrant for its search and seizure, or (3) he could have taken a trace amount of the white powder substance from the duct taped package and transported it to the precinct laboratory. If it tested positive for cocaine, he could then have obtained a proper warrant to search and seize the package.

13

2:07-cr-00738-PMD    Date Filed 04/09/08    Entry Number 62    Page 14 of 25

(*Id*. at 20.)

In Response, the Government argues that Campbell's warrantless seizure of the cocaine was proper and reasonable because Officer Campbell, "based on his training and experience, had probable cause to believe the duct-taped package contained nothing other than contraband." (Resp. in Opp'n at 13.) The Government also argues the warrantless seizure was proper because Officer Campbell "observed the contraband in plain view when the manager showed him the opened package revealing the cocaine inside." (*Id*.) The Government thus asserts that Defendant's "focus on any supposed property or possessory rights in the cocaine and whether the seizure of that cocaine was intended to be temporary or permanent is misplaced." (*Id*.)

It appears that Defendant concedes Officer Campbell had the authority to seize the duct taped package, at least temporarily. The court concludes, however, that the permanent seizure was justified under the plain view doctrine. "The 'plain view' exception to the Fourth Amendment warrant requirement permits a law enforcement officer to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be." *Washington v. Chrisman*, 455 U.S. 1, 5-6 (1982); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 465-66 (1971) ("It is well established that under certain circumstances the police may seize evidence in plain view without a warrant. . . . What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused.").

In *Horton v. California*, 496 U.S. 128 (1990), the Supreme Court considered the question of "[w]hether the warrantless seizure of evidence of crime in plain view is prohibited by the Fourth Amendment if the discovery of the evidence was not inadvertent." *Horton*, 496 U.S. at 130. In that

14

case, the victim of a robbery recognized the petitioner's voice, and upon investigation, the police determined there was probable cause to search the petitioner's home for proceeds of the robbery and for the weapons used by the robbers. *Id.* at 130-31. The warrant issued by the magistrate, however, only authorized a search for the proceeds, including three specifically described rings. *Id.* at 131. The officer searched the petitioner's residence, but he did not find the stolen property. *Id.* During the search, the officer discovered weapons in plain view and seized them; specifically, he seized "an Uzi machine gun, a .38-caliber revolver, two stun guns, a handcuff key, a San Jose Coin Club advertising brochure, and a few items of clothing identified by the victim." *Id.* This evidence was not discovered inadvertently, as the officer testified that while he was searching for the rings, "he also was interested in finding other evidence connecting petitioner to the robbery." *Id.*

The trial court refused to suppress the evidence found in the petitioner's home, and after a jury trial, petitioner was found guilty of robbery. *Id.* The Court stated,

> The right to security in person and property protected by the Fourth Amendment may be invaded in quite different ways by searches and seizures. A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property. The "plain view" doctrine is often considered an exception to the general rule that warrantless searches are presumptively unreasonable, but this characterization overlooks the important difference between searches and seizures. If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy. A seizure of the article, however, would obviously invade the owner's possessory interest. If "plain view" justifies an exception from an otherwise applicable warrant requirement, therefore, it must be an exception that is addressed to the concerns that are implicated by seizures rather than by searches.

*Id.* at 133-34 (citations omitted). The Court explained that one example of the applicability of the "plain view" doctrine occurs when police have a warrant to search a given area for specified objects, and in the course of that search, they come across some other article of incriminating character. *Id.* at 135. Furthermore, "[w]here the initial intrusion that brings the police within plain view of such

an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate." *Id.*[6]  The Court ultimately affirmed the trial court's refusal to suppress the evidence:

> [T]he items seized from petitioner's home were discovered during a lawful search authorized by a valid warrant.  When they were discovered, it was immediately apparent to the officer that they constituted incriminating evidence.  He had probable cause, not only to obtain a warrant to search for the stolen property, but also to believe that the weapons and handguns had been used in the crime he was investigating.  The search was authorized by the warrant; the seizure was authorized by the "plain-view" doctrine.

*Id.* at 142.

Defendant, citing *United States v. Paige*, 136 F.3d 1012 (5th Cir. 1998), argues Officer Campbell's seizure of the duct taped package was illegal.  In that case, two men employed by the defendant to do some roofing work were looking for some replacement siding, as they had inadvertently damaged some siding on the defendant's house, and they looked in an "attic space"

---

[6]The Court further stated,

> It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed.  There are, moreover, two additional conditions that must be satisfied to justify the warrantless seizure.  First, not only must the item be in plain view; its incriminating character must also be "immediately apparent" . . . . Second, not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself.

*Horton*, 496 U.S. at 136-37.  The court concludes these requirements have been met in the case *sub judice*.  With respect to the first requirement, Officer Campbell testified that he was able to see a white material through the cut in the package, and when asked whether it was apparent the package contained cocaine before he performed the field test, Officer Campbell testified that he believed it was cocaine.  Indeed, even Kapoulis, the hotel manager, indicated in his statement that on seeing the package he thought it contained an illegal substance.  With respect to the second requirement, there was nothing unlawful about Officer Campbell being in Kapoulis's office or looking into the black gym bag, and he had lawful access to the package as both he and the package were in Kapoulis's office.

above the garage. *Paige*, 136 F.3d at 1015. The workers saw what they believed to be drugs, and they contacted police, who looked into the attic space in the same way the workers had. *Id*. at 1016. The police recognized the odor of the substances to be marijuana and then confronted the defendant. *Id*. The defendant gave written consent to search the property, but there was an issue about whether he consented to search of the garage, as he may have believed the police had already searched that area. *Id*. at 1016 & n.8. The police then searched the garage and hauled the marijuana away. *Id*. at 1016.

The defendant filed a motion to suppress, but the district court denied the motion. *Id*. The Fifth Circuit noted the defendant did not argue the actions by the two workers violated his Fourth Amendment rights, and the court then decided that, on the circumstances, because the risk of intrusion into the garage attic was reasonably foreseeable, the workers' searches "stripped [the defendant] of his reasonable expectation of privacy in the attic." *Id*. at 1021. As a result, the court concluded the detective's subsequent examination of the attic did not qualify as a "search" pursuant to the Fourth Amendment. *Id*.

The defendant also argued that his Fourth Amendment rights were violated because the police did not secure a warrant before the marijuana was seized. *Id*. The government argued that because any privacy interest in the marijuana had been extinguished, and because it was apparent to the police that the packages contained only contraband, the *Jacobsen* doctrine "sanctified" the warrantless seizure. *Id*. at 1022. Although the court ultimately found the warrantless permanent seizure to be justified, the court rejected the government's argument:

> Unlike the seizure at issue in *Jacobsen*–which was designed only to be a temporary one for the purpose of investigating, seizing, and testing the package's contents–the seizure in the instant case was intended to be permanent from the outset. That the holding in *Jacobsen* was not intended to apply to permanent seizures–but only to

17

temporary investigatory detentions of property–is made clear by the language used by the Court: "Such containers [*i.e.*, ones having no justifiable expectation of privacy] may be seized, *at least temporarily*, without a warrant[,] based on probable cause to believe they contain contraband." Our interpretation of *Jacobsen* is consistent with its facts, as the officer in that case seized the package only for the time necessary to observe the bags contained therein and to perform a field test on a trace amount of the contents. After the test was completed, the package was rewrapped, a warrant was obtained to search the place to which it was addressed, and the warrant was executed. Although it is quite possible that the results of a temporary seizure may thereafter justify a more permanent seizure, the *Jacobsen* Court did not address this possibility (with respect to the package at issue therein), and the government does not make that argument here. As such, *Jacobsen*, which evaluated the reasonableness of an officer's warrantless, temporary seizure of a package, is distinguishable on its facts, and we refuse to apply it to the permanent seizure executed in this case.

*Id.* at 1022-23 (citations omitted) (quoting *Jacobsen*, 466 U.S. at 121).

Despite the Fifth Circuit's refusal to apply *Jacobsen* to the permanent seizure, the court held the government's permanent seizure of the marijuana was justified under the plain view doctrine. *Id.* at 1023. The court noted the conditions that must be satisfied before a plain view seizure is upheld:

(1) the officer conducting the seizure must lawfully arrive at the position from which the object is plainly seen; (2) the object must be in plain view; (3) the object's incriminating character must be immediately apparent–*i.e.*, the officer must have probable cause to believe the object is contraband or evidence of a crime; and (4) the officer must have a lawful right of access to the object itself.

*Id.* Finding all of these requirements of the plain view doctrine to be met, the Fifth Circuit affirmed the district court's denial of the motion to suppress. *Id.* at 1023-24.

In the case *sub judice*, Officer Campbell was lawfully in Kapoulis's office at the hotel, and his search of the package and black gym bag did not exceed the scope of the private search. Officer Campbell testified that he believed the package contained cocaine even before he performed a field test. Furthermore, this case does not concern the problem where an officer is able to view an object

18

but does not have access to it, as both Officer Campbell and the duct-taped package were in Kapoulis's office.  The court thus concludes the warrantless seizure was justified.

Story's third argument is that "Officer Campbell's illegal search and seizure of the cocaine and the black bag cannot be the basis for a subsequent search warrant for Room 411."  (Mot. to Suppress at 21.)  "The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search." *Murray v. United States*, 487 U.S. 533, 536 (1988) (citations omitted).  This rule "also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" *Id.* (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).  Because the court concludes there has been no illegal search or seizure, no issues regarding the exclusionary rule arise.

Story then demands a *Leon/Franks* hearing and asserts the search warrant should be quashed. (Mot. to Suppress at 21.)  He argues "there was no probable cause to issue the search warrant and the good faith exception to the exclusionary rule, as articulated in *United States v. Leon*, 468 U.S. 897 (1984), is inapplicable."  (*Id.* at 21-22.)  The good faith exception does not apply "if the magistrate or judge issuing the warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Leon*, 468 U.S. at 923.  It is also inapplicable if the magistrate wholly abandons his judicial role, such that "no reasonably well trained officer should rely on the warrant."  *Id.*  The Court further stated that an officer would not "manifest objective good faith in relying on a warrant based on an affidavit so

lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* (internal quotation marks omitted).

In the case *sub judice*, the following affidavit was submitted to the magistrate:

DESCRIPTION OF THE PREMISES (PERSON, PLACE OR THING) TO BE SEARCHED
        The location to be searched is located at 5035 International Blvd. North Charleston, SC 29405.  The location is better described as a multi-story hotel with a reddish orange in color stucco exterior with white trim.  The room is located on the fourth floor interior.  The numbers 411 are gold and clearly posted on the right side of the door to the room.  To get to this location, 5035 International Blvd. from North Charleston City Hall located at 4900 Lacross Drive one would turn right onto Mall Drive and continue until one reaches Montague Avenue.  One would turn right onto Montague Avenue.  While on Montague Avenue one would continue until International Blvd. turning right onto International Blvd.  Then one would turn left into the parking lot of 5035 International Blvd. (Residence Inn).  To include all rooms, attics, basements, closets, cabinets, safes, false walls, and any other location that could conceal illegal narcotics or evidence of illegal narcotics trafficking and/or sales.  Also to include any outbuildings or storage areas located on the property and the grounds within the property's borders.  The location has been identified as a place where illegal narcotics are used, sold, or stored, and it is common in such places that subjects conceal illegal narcotics and/or weapons on their person, therefore, also to include all persons located at the business at the time the search is executed.  Also in these locations, it is common to have numerous vehicles coming to and from the business and that illegal narcotics are transported in these vehicles, therefore, also to include any vehicles located at the residence at the time the search is executed.

REASON FOR AFFIANT[']S BELIEF THAT THE PROPERTY SOUGHT IS ON THE SUBJECT PREMISES
        The North Charleston Police Department Narcotics Bureau met with Officer David Campbell who was dispatched to 5035 International Blvd. in reference to the house keeper finding a brick like package containing a white powder substance[.] [T]he package was found inside the safe located in the room #411.  The white powder substance field-tested presumptive for [c]ocaine.

Story argues the magistrate or judge issuing the warrant "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." (Mot. to Suppress at 22.)  Story specifically points to the statement in the

20

affidavit that the location has been identified "as a place where illegal narcotics are used, sold, or stored." (*Id*.) According to Story, "the contention that narcotics were 'used' or 'sold' or 'stored' is a product of the detective's vivid imagination and not facts developed during an investigation." (*Id*. at 23.) In *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), the Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."

The problem with Story's argument, however, is that he has not made any sort of showing of a false statement included in the affidavit. The affidavit indicates that Room 411 has been identified as a place where narcotics are stored. Such statement is, in fact, true, as the duct taped package contained in the safe of Room 411 was a kilogram of cocaine. Story also argues the detective "omitted to state to the court that the police lacked any knowledge whatsoever about on-going criminal activity because the police knew nothing about the occupants of room 411, other than Drayton's name and address." (Mot. to Suppress at 23.) While the police did not have extensive knowledge about the identity of the individuals occupying Room 411, they did know that a kilogram of cocaine had been found in the safe and that the occupants were expected to return. As the Government states, Story's argument "flies in the face of the obvious fact that a kilogram of cocaine was discovered in the safe of Room 411 where the current occupants reasonably could be expected to return." (Resp. in Opp'n at 17.) The court concludes that Defendant has not made a showing that a false statement was included in the affidavit.

Story also asserts the magistrate wholly abandoned his judicial role and that the warrant was

based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.  (Mot. to Suppress at 23-24.)  Given the undisputed fact that one kilogram of cocaine was found in the safe of Room 411, the court rejects these arguments.

## B.  Motion to Dismiss Indictment

Defendant argues this court should dismiss the indictment.  (Mot. to Suppress at 24.) Specifically, Defendant states,

> When Story left Room 411 and entered the hallway, the police had no probable cause to seize and search the gym bag or arrest Story.  As part of their plan to catch Story, the police knew that viewing Story opening the safe and putting the look-alike package in the gym bag was crucial in establishing that Story actually had possession of a controlled substance, albeit a look-alike package, and this is the reason that prompted them to establish surveillance with the video camera and audio recorder.  But the equipment failed.  The police never saw Story put the package in the gym bag.  At the time of the actual arrest, the police only knew that the gym bag contained shoes, gym gear, and other clothes–nothing illegal.  When arrested, Story had no weapons and no controlled substances–merely a look-alike package.  After his arrest, the police searched the Escalade, which was in the Marriott parking lot, and found two pistols.

(*Id*. at 24-25.)  Story essentially makes two challenges to the indictment: (1) the Government will not be able to establish that he possessed a controlled substance or that he violated 18 U.S.C. § 924(c)(1), and (2) police did not have probable cause to arrest him.

As the Government notes, Story's first argument is essentially that the Government will not be able to prove the elements of the offenses at issue.  For example, he asserts that he could not reasonably be said to "use" or "carry" a firearm when the firearms were in the Escalade and he was arrested on the fourth floor of the hotel, and he further asserts that no evidence establishes possession as there is no evidence that he *actually* possessed a firearm and he never exercised dominion and control over the vehicle in which the firearms were found.  (*Id*. at 25-27.)  At this point in time, however, Story's challenge to the sufficiency of the evidence must fail.  In *United*

*States v. Mills*, 995 F.2d 480 (4th Cir. 1993), the appellant Mills appealed the district court's denial

of his motion to dismiss the indictment.  At trial, the DEA agent who testified at the grand jury

proceeding admitted that he inadvertently confused another individual with the defendant Mills in

his testimony.  *Mills*, 995 F.2d at 483.  When the defendant's motion to dismiss the indictment was

denied, he appealed, claiming he was "deprived of his Fifth Amendment rights to due process and

grand jury indictment because he was indicted for the conduct of another." *Id.* at 486.  The Fourth

Circuit affirmed, noting the Court in *Costello v. United States*, 350 U.S. 359 (1956), was "urged, but

declined to hold, that defendants may 'challenge indictments on the ground that they are not

supported by adequate or competent evidence.'" *Mills*, 995 F.2d at 487 (quoting *Costello*, 350 U.S.

at 364).  The Supreme Court "has clearly indicated its unwillingness to second guess the decision

of the grand jury to formally accuse an individual brought before it based upon some incriminating

evidence," and the Fifth Amendment "requires only that, [a]n indictment returned by a legally

constituted and unbiased jury, . . . if valid on its face, is enough to call for trial of the charges on the

merits." *Id.* (internal quotation marks omitted); *see also United States v. Wills*, 346 F.3d 476, 488

(4th Cir. 2003) ("This court has held that courts lack authority to review the sufficiency of evidence

supporting an indictment, even when a mistake was . . . made.").  Story is thus not able to challenge

the sufficiency of the evidence at this time.

Story's last argument is that police lacked probable cause to arrest him and thus lacked a

legitimate basis for searching the black gym bag (as a search incident to arrest).  (*See* Mot. to

Suppress at 29-31.)  "Police officers can make warrantless arrests as long as they act on the basis

of probable cause." *United States v. Williams*, 10 F.3d 1070, 1073 (4th Cir. 1993).  Probable cause

to justify an arrest "'means facts and circumstances within the officer's knowledge that are sufficient

to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id*. at 1073-74 (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).  Probable cause requires more than "a mere suspicion, rumor, or strong reason to suspect but less than evidence sufficient to convict." *Id*. at 1074.  Furthermore, a warrantless search of a person and his personal effects is permissible if incidental to an arrest if the arrest is made on the basis of probable cause. *See Ker v. California*, 374 U.S. 23 (1963).  A warrantless search incident to arrest may be conducted of the area within the defendant's immediate control from which he or she might be able to gain possession of a weapon or destroy evidence. *See Chimel v. California*, 395 U.S. 752, 762-63 (1969).

Story argues the police did not have probable cause to arrest him because they never saw Story enter the safe or put the sham kilogram of cocaine in the gym bag.  (Mot. to Suppress at 30.) He asserts that when he walked out of Room 411, "so far as the police knew, he had done nothing wrong."  (*Id*.)  The Government, on the other hand, asserts that the officers had probable cause to arrest because (1) the Defendant entered Room 411, where a kilogram of cocaine had been found; (2) the police could reasonably believe that, outside of hotel personnel, only Story and Drayton had access to the safe, as they were the occupants of the room both at the time of the discovery of the cocaine and at the time of the arrest; (3) officers witnessed the Defendant enter Room 411 and quickly exit with a black gym bag that the officers knew had been located on top of the safe containing the cocaine; and (4) when police announced their presence, Defendant attempted to flee. (Resp. in Opp'n at 23.)

Probable cause must be determined on the totality of the circumstances.  *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003).  Furthermore, there is no requirement that the officers actually

24

observe the commission of a crime. *See Sibron v. New York*, 392 U.S. 40, 66 (1968) ("It is difficult to conceive of stronger grounds for an arrest, sort of actual eyewitness observation of criminal activity."). In the case *sub judice*, the officers knew that a kilogram of cocaine had been discovered in the locked safe of Room 411, and they observed Story and Drayton enter Room 411 on the morning in question. While they did not see Story place the sham kilogram of cocaine into the black gym bag, they did see Story exit Room 411 carrying the bag, which they knew had been placed on top of the safe. Furthermore, when the police announced their presence, Story attempted to flee. On these circumstances, the court concludes the police had probable cause to effectuate an arrest. As the police had probable cause to arrest Defendant, the subsequent search of the black gym bag was part of a lawful search incident to arrest, as the bag was certainly within the area of his immediate control.

## CONCLUSION

It is therefore **ORDERED**, for the foregoing reasons, that Defendant's Motion to Suppress and Motion to Dismiss Indictment is **DENIED**.

**AND IT IS SO ORDERED**.

PATRICK MICHAEL DUFFY
United States District Judge

**Charleston, South Carolina**
**April 9, 2008**